**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez, Esquire (LR6767)
3 Kings Highway East
Haddonfield, New Jersey 08033
(856) 795-9002

**Attorneys for Plaintiffs**
**(Additional Counsel on Signature Page)**

RECEIVED
WILLIAM T. WALSH, CLK

NOV 12 A 9: 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Richard R. Furstenau and David G. Ingber, on behalf of the AT&T Long Term Savings Plan for Management Employees and all other persons similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>AT&T Corporation, Joanne Sisto, and Fiduciaries C. Michael Armstrong, Kenneth T. Derr, M. Kathryn Eickhoff, Walter Y. Elisha, George M.C. Fisher, Donald V. Fites, Ralph S. Larsen, John C. Malone, Donald F. McHenry, Michael I. Sovern, Sanford I. Weill, Thomas H. Wyman, and John D. Zeglis,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 02-5409(GEB)

**FILED**

NOV 12 2002

AT 8:00  9:28 A M

WILLIAM T. WALSH
CLERK

## COMPLAINT

Plaintiffs, Richard R. Furstenau and David G. Ingber, on behalf of the AT&T Long Term Savings Plan for Management Employees (the "Plan"), and on behalf of a class of similarly situated participants in the Plan (the "Participants"), by their attorneys, alleges the following for their Complaint (the "Complaint"):

## NATURE OF THE ACTION

1.     Plaintiffs, Participants in the Plan, bring this action for Plan-wide relief on behalf of the Plan, and on behalf of a class of all Participants in the Plan for whose individual accounts the Plan purchased and held shares of the AT&T Stock Fund, AT&T stock, the AT&T Wireless Stock Fund and/or AT&T Wireless stock (collectively, "AT&T stock funds" or "stock") between September 30, 1999 and May 1, 2000 (the "Class"). Excluded from the Class are Defendants herein, officers and directors of AT&T Corporation ("AT&T" or "Company"), members of their immediate families, and the heirs, successors or assigns of any of the foregoing. Defendants are AT&T, which is the Sponsor and a fiduciary of the Plan, as well as all other Plan fiduciaries. Plaintiffs bring this action on behalf of the Plan and the Class pursuant to §502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132(a)(2)and (3).

2.     As more fully set forth below, Defendants breached their fiduciary duties to the Plan and the Participants, including those fiduciary duties set forth in ERISA §404, 29 U.S.C. §1104, and Department of Labor Regulations, 29 C.F.R. 2550, in various ways, including, but not limited to, (i) permitting the Plan to purchase and maintain its investment in AT&T and AT&T Wireless ("AWE") stock, and continuing to offer such stock as a n investment option, when it was imprudent to do so; (ii) misrepresenting and failing to disclose material facts to the Plan and the Participants in connection with the administration of the Plan; (iii) failing to exercise their fiduciary duties to the Plan and the Participants solely in the interests of the Participants and their Beneficiaries for the exclusive purpose of providing benefits to Participants and their Beneficiaries; and (iv) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent man under the circumstances and imprudently failing to diversify the investments in the Plan so as to minimize the risk of large losses. As a result of

2

these wrongful acts, pursuant to ERISA §409(a), 29 U.S.C. §1109(a), Defendants are personally

liable to make good to the Plan the losses resulting from each such breach of fiduciary duty.

Plaintiffs also seek equitable relief.

3.    The Participants' directions to the Plan to purchase or to hold shares of AT&T

and/or AWE stock were not freely and independently made. Instead, the Defendants breached

their fiduciary duties as alleged in this Complaint, depriving the Participants of the opportunity

to direct the Plan to make investments on the basis of all material facts and in the context of

Defendants' proper discharge of their duties.

## JURISDICTION AND VENUE

4.    Plaintiffs' claims arise under and pursuant to ERISA §502, 29 USC §1132.

5.    This Court has jurisdiction over this action pursuant to ERISA §502(e)(1), 29

U.S.C. §1132(e)(1).

6.    Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C.

§1132(c)(2), because this is the district where the Plan is administered, where the breaches took

place and where one or more defendants reside or may be found.

## THE PARTIES

7.    Plaintiff Richard R. Furstenau is a resident of the State of Illinois and is was at all

relevant times a Participant in the Plan within the meaning of ERISA §3(7), 29 U.S.C. §1002(7).

8.    Plaintiff David G. Ingber is a resident of the State of Florida and is and was at all

relevant times a Participant in the Plan within the meaning of ERISA §3(7), 29 U.S.C. §1002(7).

9.    Defendant AT&T International Inc. is headquartered in Basking Ridge, New

Jersey and New York City, New York.

3

10.    Joanne Sisto is the Savings Plan Administrator. She signed the Plan's 2001 Annual Report on Form 11-K, filed with the SEC on June 28, 2002 in her fiduciary capacity on behalf of the Plan.

11.    At all times relevant to this complaint, C. Michael Armstrong, Kenneth T. Derr, M. Kathryn Eickhoff, Walter Y. Elisha, George M.C. Fisher, Donald V. Fites, Ralph S. Larsen, John C. Malone, Donald F. McHenry, Michael I. Sovern, Sanford I. Weill, Thomas H. Wyman, and John D. Zeglis ("Director Defendants") were members of the Board of Directors of AT&T.

## CLASS ACTION ALLEGATIONS

12.    Plaintiffs bring this action in part as a class action pursuant to Rules 23(a) and (b)(1) and(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all Participants in the Plan for whose individual accounts the Plan held shares of AT&T and/or AWE stock between September 30, 1999 and May 1, 2000. Excluded from the Class are Defendants herein, officers and directors of AT&T, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

13.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class.

14.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

     a.    whether Defendants were fiduciaries;

     b.    whether Defendants breached their fiduciary duties;

4

c.    whether the Plan and the Participants were injured by such breaches; and

d.    whether the Class is entitled to damages and injunctive relief.

15.    Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

16.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained competent counsel. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

17.    Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

18.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

19.    The Plan is an employee benefit Plan within the meaning of ERISA §§3(3) and 3(2)(A), 29 U.S.C. §§1002(3) and 1002(2)(A).

5

20.     The Plan is a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3 (34), 29 U.S.C. §1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's accounts.

21.     The Plan provides a number of different options for investment of the Plan's assets, including AT&T and AWE stock funds.

22.     The Plan provides that AT&T will make matching contributions in an amount equal to a percentage of the employee's contributions and salary. These contributions were invested according to the investment choices as directed by the Participants.

23.     Participants direct the Plan to purchase investments from among the investment options available in the Plan and allocate them to their individual accounts.

24.     AT&T is the Sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

25.     AT&T is the administrator of the Plan within the meaning of ERISA §3 (16)(A), 29 U.S.C. § 1002(16)(A). AT&T has responsibility and control over management of Plan assets.

26.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because they exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan, and because they made representations to Participants for the purpose of affecting Participant decisions with respect to the Plan.

6

27.    Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA §405, 29 U.S.C. §1105.

## ADMINISTRATION OF THE PLAN

28.    Defendants, as fiduciaries of the Plan, are required under ERISA to furnish certain information to Participants. For example, ERISA §101, 29 U.S.C. §1021, requires the Plan's Administrator to furnish a Summary Plan Description to Participants. ERISA §102, 29 U.S.C.§ 1022, provides that a Summary Plan Description must apprise Participants of their rights and obligations under the Plan.

29.    Defendants had the discretion to establish and change the investment alternatives among which Plan participants could direct the investment of the Plan's assets allocated to their accounts.

30.    Defendants had a duty to review the Plan's investment policy and the selection and the performance of investment alternatives offered under the Plan. On information and belief, there was no requirement that any Plan assets contributed by Participants or the proceeds thereof be invested in Company stock or that Company stock be continued as an investment alternative, either for new funds (resulting from new contributions or the re-allocation of existing funds in individual accounts) or existing individual account balances.

31.    The Plan's Administrator had the duty and responsibility to distribute to Plan participants information explaining the Plan.

32.    Defendants had a duty to obtain from the Company information necessary for the proper administration of the Plan.

7

## BREACHES OF FIDUCIARY DUTY

33.    As required by ERISA, Defendants issued Summary Plan Descriptions which, upon information and belief, expressly incorporated by reference all of the documents filed by AT&T with the Securities and Exchange Commission (the "SEC") under the federal securities laws. AT&T further filed with the SEC S-8 Forms which incorporated by reference these same documents filed with the SEC. These filings were signed by AT&T and were either signed by or, upon information and belief, approved by the Director Defendants. As set forth below, certain of these filings contain the following material misrepresentations concerning AT&T's (and AWE's) financial condition which at the very least Defendants should have known were false:

a.    AT&T filed a Form 8-K with the SEC on December 6, 1999, which included the following:

> AT&T projected total pro forma revenue growth in 2000 to range between 8 - 9 percent, a 30 - 60 percent increase from the revenue growth rate expected for 1999, excluding the impact of Concert, the global joint venture with BT. Operational earnings per share (EPS) for 2000 is projected to range between $2.10 - $2.15. Cash EPS (which adds back the impact of amortization of purchased intangibles) in 2000 is expected to range between $2.50 - $2.60. Operational earnings before interest, taxes, depreciation and amortization (EBITDA) are projected to range between $24 billion - $26 billion in 2000.

> Following three consecutive quarters of comparable growth of 40 percent or more, the [AT&T Wireless] unit expects to report revenues of more than $7.6 billion this year. EBITDA, excluding other income, grew 53 percent in the third quarter of 1999 versus the year-ago quarter, due to revenue growth and an improving cost structure.

> By highlighting the exceptional performance of AT&T's fast-growing wireless operations, we are confident that investors will

see the value of this business," said Armstrong. "That unlocked value, which will be reflected in the tracking stock, will provide us with the currency to take advantage of the outstanding growth opportunities available in the wireless industry, including fixed wireless, wireless data and international expansion.

Dan Hesse led the transformation of the wireless industry with the introduction of Digital One Rate, fueling AT&T's wireless growth and market share gains. And Michael Keith has demonstrated that he knows how to develop new products and markets. Under his leadership, AT&T's growth in frame relay, IP and other packet data services outstripped the industry, making Business Services our biggest revenue engine."

AT&T Wireless is expected to continue to grow at a level outpacing the industry on a number of fronts. Revenue growth is expected to range between 25 - 30 percent in 2000. EBITDA growth, excluding other income, is projected to range between 35 - 40 percent compare to an industry average of 29 percent in 2000. And subscriber growth is expected to grow between 21 - 24 percent, compared to an industry growth rate projected at 21 percent.

By increasing revenues from high-growth services such as data/IP, AT&T Solutions and local, Business Services [unit] is expected to grow revenue between 9 - 11 percent in 2000. The percentage of Business Services revenue that comes from voice long distance is expected to decrease to 53 percent of the unit's total revenue in 2000, down from 59 percent projected for 1999. Revenue growth for packet-based services (IP, frame-relay, ATM) is expected to grow more than 60 percent in 2000.

AT&T Solutions expects to exceed its 40-percent growth rate this year and is expected to grow another 38 - 40 percent next year. Revenue is projected to reach $4 billion in 2002.

AT&T said its Broadband and Internet Services unit is meeting or exceeding targets for upgrading facilities, consolidating systems and accelerating the rollout of a new generation of communications, information and entertainment services.

AT&T said it will have about 51 percent of its cable facilities upgraded to two-way capability by the end of this year and will have 85 percent completed by year-end 2000. Broadband

telephony trials are underway in eight markets -- 13 cities -- and the company expects to have between 400,000 and 500,000 customers in 2000. High-speed Internet service through AT&T@Home is also in strong demand. AT&T currently has 164,000 AT&T@Home customers, will have about 277,000 customers by the end of the first quarter of 2000 and expects to have more than 700,000 customers by the end of next year. Every day, AT&T adds more than 3,000 new digital cable customers. Next year, the company said it will have between 2.5 - 3.0 million digital cable customers, about 25 percent of its subscriber base.

The company expects the Broadband and Internet services unit to increase revenues between 12 - 14 percent next year and is aggressively building five high-growth businesses -- telephony, high-speed Internet access, video, interactive video services and broadband for business. Revenue growth for cable operations is expected to increase in the high-single digits in 2000. And operating cash flow is expected to grow in the mid- to high-single digits next year.

With unprecedented demand for high-speed bandwidth and Internet-based services, the company announced that it had begun an aggressive plan to work with three companies to add a new overlay, state-of-the-art, fiber-optic network to link 30 major metropolitan areas nationwide. "This project allows us to maintain our low-cost position in the industry, leapfrog our competitors and provide quick and economical deployment of ultra high-speed bandwidth OC-192, and later OC-768, technology," said Frank Ianna, president of AT&T Network Services.

By working with three companies in a cost-sharing arrangement, AT&T plans to complete the expansion in the next 24 months - considerably faster and at a cost of 40 percent less than it would have been otherwise. When the expansion is completed, AT&T will be among the first to offer ultra-high-speed OC-192 services initially and OC-768 services when available. The 30 metropolitan areas are expected to generate about 80 percent of the future demand for high-speed services. Excess fiber capacity will be leased to other companies to generate incremental revenue.

Armstrong also reported that Concert, AT&T's global joint venture with BT, was making good progress. "We have completed the operational close and fully expect the financial closing in early January," he said.

With the convergence of television, computing and telephony, no other company is better positioned than AT&T to offer a whole new generation of communications services to families and businesses worldwide," Armstrong said. "In 1998, AT&T set its strategy and began to make investments. This year we focused on integration and execution. Now, with the groundwork we've completed, we can begin to achieve scale and accelerate growth in 2000.

      b.      AT&T filed a Form 8-K filed with the SEC on December 6, 1999, which

included the following:

AT&T is the largest wireless service provider in North America, delivering wireless service to nearly 12 million people. Following three consecutive quarters of comparable growth of 40 percent or more, the unit expects to report revenues of more than $7.6 billion this year. EBITDA, excluding other income, grew 53 percent in the third quarter of 1999 compared to the year-ago quarter, due to revenue growth and an improving cost structure.

By highlighting the exceptional performance of AT&T's fast-growing wireless operations, we are confident that investors will see the value of this business," said AT&T Chairman C. Michael Armstrong. "That unlocked value, which will be reflected in the tracking stock, will provide us with the currency to take advantage of the outstanding growth opportunities available in the wireless industry, including fixed wireless, wireless data and international expansion.

We are excited about the opportunities the AT&T Wireless Group has to grow its business and create shareholder value by offering customers wireless connectivity -- whether for voice or data -- wherever they may be, in their homes or on the road, moving about in the U.S. or abroad," said [CEO] Zeglis. "We'll bring together the two great revolutions in communications: untethered connections and the Internet. The extraordinary convenience of blending information and personal mobility will put the Internet in people's pockets as we make wireless data service as popular and easy to use as wireless voice service.

The AT&T Wireless Group will pursue four business opportunities focused on growth within the wireless industry: voice and data mobility, fixed wireless, international wireless and e-business investments.

AT&T Wireless is a growth engine hitting on all cylinders. We'll take a disproportionate share of the growth in wireless mobility by pursuing three priorities - completing our national footprint, achieving cost leadership and leading the wireless data revolution," Hesse said.

AT&T's wireless growth was driven by the continued success of targeting and retaining high-value customers, expanding the national wireless footprint, focusing on digital service and offering simple, compelling rate plans. The company has been a leader in digitizing its network and rapidly migrating customers to digital service. The introduction of its flat-rate, all-distance "bucket of minutes" Digital One Rate plan in 1998 revolutionized the wireless industry. In addition to its continued growth in wireless customers, AT&T's focus on high-value subscribers has helped generate increased volume and improved average revenue per user.

    c.     AT&T filed a Form 8-K filed with the SEC on January 14, 2000, which

included the following:

AT&T Chairman C. Michael Armstrong reaffirmed the company's confidence in meeting its 1999 and 2000 financial targets, speaking at a conference of financial analysts today.

AT&T is also ahead of target in upgrading its cable facilities for two-way communications. It now offers local phone service over its broadband cable facilities in 16 cities, and is adding customers at three times the rate as in November, Armstrong said.

Our strategy for growth is on track as we transform AT&T from a domestic long distance company to an any-distance, any-service global company," he said. "No one should doubt our resolve to deliver customers a choice for local telephone service and more.

When reporting fourth quarter financial results on January 25, Armstrong said AT&T expects to announce that total pro forma revenue grew between 5 to 7 percent in 1999. Earnings per share (EPS) for 1999 are expected to be between $2.15 to $2.20. Earnings before interest, taxes, depreciation and amortization (EBITDA) for 1999 is expected to be at the high end of the previously announced range of $18 to $20 billion.

For 2000, Armstrong reaffirmed that total pro forma revenue growth will range between 8 to 9 percent, a 30 to 60 percent increase from the revenue growth rate expected for 1999, excluding the impact of Concert, the global joint venture with BT. Earnings per share for 2000 are projected to range between $2.10 to $2.15 (which also excludes the impact of Concert). Cash EPS (which adds back the impact of purchased intangibles) in 2000 is expected to range between $2.50 to $2.60. Operational EBITDA is projected to range between $24 billion to $26 billion in 2000.

We've met or exceeded our revenue growth commitments for seven consecutive quarters," Armstrong said. "We intend to build on that track record as we execute our any-distance strategy." Armstrong also outlined growth prospects for 2000 for the "core" AT&T, in light of the company's plans to create a wireless tracking stock. Even without wireless, he said, the rest of AT&T will grow revenue 5 to 6 percent, and EBITDA is expected to range between $22 billion to $24 billion

    d.     AT&T filed on March 27, 2000 a Form 10-K with the SEC for the period ending

December 31, 1999 which included the following:

Business Services provides a variety of global communications services including long distance, local and data and IP networking to large domestic and multinational businesses, small and medium-sized businesses, and government agencies. Business units within this group provide regular and custom long distance and local communications services, data transmission and Internet services, 500 services, toll-free or 800 and 888 services, 900 services, private line services, software defined network services (SDN), asynchronous transfer mode (ATM) and Internet protocol (IP) technology based services, integrated services digital network (ISDN) technology based services, electronic mail, electronic data interchanges, and enhanced facsimile services.

AT&T Broadband offers a variety of services through its cable broadband network, including traditional analog video and new services such as digital cable and AT&T@Home, which offers high-speed cable Internet access service. Also included in AT&T Broadband are the operations associated with developing and refining the infrastructure that will support broadband telephony.

The AT&T Wireless Group is one of the largest wireless service providers in the United States, based on approximately $7.6 billion in revenues for the year ended December 31, 1999. Including its partnership markets, the AT&T Wireless Group had over 12 million total subscribers as of December 31, 1999.

The AT&T Wireless Group operates one of the largest U.S. digital wireless networks. The AT&T Wireless Group, including its partnership and affiliate markets, currently holds 850 megahertz and 1900 megahertz licenses to provide wireless services covering 94% of the U.S. population, with approximately 81% of the U.S. population covered by at least 30 megahertz of wireless spectrum as of December 31, 1999. As of December 31, 1999, the AT&T Wireless Group's built network, including partnership and affiliate markets, covered 65% of the U.S. population. This includes operations in 42 of the 50 largest U.S. metropolitan areas. The AT&T Wireless Group supplements its own operations with roaming agreements that allow its subscribers to use other providers' wireless services in regions where the AT&T Wireless Group does not have operations. Through these roaming agreements, the AT&T Wireless Group is able to offer its customers wireless services covering over 95% of the U.S.population.

The AT&T Wireless Group offers a variety of services for both voice and data communications. Service can include wireless voice transmission as well as custom calling services for digital services, such as voicemail, call forwarding, call waiting, caller ID, three-way calling, no-answer and busy transfer. The AT&T Wireless Group also offers a variety of other enhanced features, including display messaging, which allows a cellular phone to receive and store short alphanumeric messages and pages and to provide subscribers with notification of voicemail messages, even if the handset is in use or switched off, extended battery life and enhanced directory assistance, which enables callers to be connected to the party whose number was sought without hanging up and redialing.

In the future, the AT&T Wireless Group expects a number of additional applications will be developed, including e-commerce and shopping services and services that are enhanced by information about the user's location. By providing or facilitating such applications, the AT&T Wireless Group believes it can generate new revenue streams, as well as develop personalized relationships with its customers.

In 1999, we made significant strides to transform AT&T and deliver growth. We finalized many of the strategic acquisitions we announced in 1998 and made additional investments to further support our facilities-based growth strategy. We continued to maintain the execution-focused culture of the new AT&T.

One of the most dynamic areas in 1999 was our wireless business. Increasing demand for wireless services and the continued appeal of our Digital One Rate (sm) plans drove Wireless Services revenue to grow approximately 40% for the year. Throughout 1999 we continued to expand our national footprint. In the second quarter, we completed the acquisition of Vanguard Cellular Systems, which was announced in 1998; in August we closed the acquisition of Honolulu Cellular; and in October we announced the acquisition of American Cellular Corp. through a newly created joint venture between AT&T and Dobson Communications. We capped off the year by proposing the creation of a new class of tracking stock that will reflect the economic performance of the AT&T Wireless Group. While the Wireless Group will remain part of AT&T, the separate tracking stock will provide current shareowners and future investors with a security tied directly to the performance of this business.

As we worked to grow our wireless businesses in 1999, we also started putting the bricks and mortar around our broadband plans - a key component of our overall growth strategy. We completed our $52 billion merger with Tele-Communications, Inc. (TCI) in March, and quickly accelerated the upgrade of the TCI cable plant, which will enable us to develop additional revenue streams from any-distance cable telephony, high-speed data, and digital video. By the end of 1999, TCI, renamed AT&T Broadband, was offering cable telephony in 16 cities within nine pilot markets, digital-video subscribers totaled approximately 1.8 million, and more than 200,000 customers had signed up for high-speed data service. To expand our national cable network beyond AT&T Broadband's systems, we announced in May the $57 billion merger with MediaOne. When the merger is completed in 2000, we will significantly increase our presence in major metropolitan markets across the country with owned and operated cable systems passing more than 26 million homes.

In 1999, Business Services revenue grew $1,491 million, or 6.3%, driven by data and IP services, domestic long distance voice services and local services.

15

34.    The statements set forth at Paragraph 32 were materially false and misleading for the following reasons:

a.    Downsizing and reorganization occurring throughout 1998 and 1999 had resulted in serious sales and customer service problems which enraged many of AT&T's large international corporate long-distance customers causing them to lose many such clients including Pepsi, Chase Manhattan, Bank of New York, SuperValue Inc., and Paper Mart.  These problems also resulted in a rapid erosion of AT&T's low-speed private-line business and a sharp slowdown in its wholesale voice revenues, which were dependant on this same customer base.  These problems in AT&T's key Business Services unit were exacerbated by AT&T's loss during 1999 of two large U.S. government long-distance contracts (the FTS 2000 contracts) and a huge ($650 million per year) BP Amoco PLC contract depriving AT&T of millions of dollars of previously in-place revenues.  As a result of these negative factors, the representations about AT&T's increased competitiveness, the success of AT&T's Concert joint venture and its business long-distance service and the accelerating revenue growth of AT&T's Business Services unit were false.

b.    The statements about the broadband build-out were false and misleading because AT&T's broadband build-out for its cable operation was significantly behind schedule and over budget due to technical difficulties and other problems being encountered.

c.    The statements about AT&T's success in delivering bundled telecommunications services were false and misleading because AT&T's attempt to deliver bundled services of digital cable TV, high speed Internet access, data transmission, long-distance and local telephone and wireless communications services was failing and could not be achieved

16

due to AT&T's inability to successfully integrate the acquisitions it had made over the prior few years and its inability to efficiently and effectively deliver bundled services.

        d.      The above statements - especially the bundled services representations - were also misleading due to the failure to disclose that AT&T's top executive team was planning to break-up AT&T into three or four separate companies after the AT&T Wireless tracking stock IPO was completed.

        e.      The statements concerning the AT&T Wireless operations were also misleading because of various efforts the company employed to boost its reported sales growth. For example, sales management utilized a Transfer of Authorization ("TOA") program to give a false impression of exceptional growth in its subscriber base when in fact AT&T Wireless had one of the worst "churn" rates in the industry and was experiencing a marked slowdown in subscriber growth.

    35.      Based on the forgoing, at least by September 30, 1999, AT&T was an imprudent investment. AWE was an imprudent investment from the day it was first issued.

    36.      Defendants also misrepresented to Participants the riskiness of their accounts by only disclosing that their accounts were "exposed to market risk in the event of a significant decline in the value of AT&T Corp. stock, Liberty Media Group stock and/or AT&T Wireless Group stock." They similarly misrepresented that the performance of an investment in an AT&T stock fund " is directly tied to the performance of the company that issued the stock"and that the performance of the investment " will vary depending on the performance of AT&T...." These statements were false and misleading in that they failed to disclose that performance and value of the stock in Particpants' accounts were affected by the conduct alleged above.

17

37.    Pursuant to ERISA §404(a), 29 U.S.C. §1104(a), Defendants have a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

38.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA §404(a)(1)(d) (29 U.S.C. §1104(a)(1)(D)).

39.    Defendants are not entitled to the protections of ERISA §404(c), 29 U.S.C.1104(c), because the Participants did not exercise independent control over their accounts because Defendants subjected them to improper influence with respect to the Plan's investments in AT&T and AWE stock, Defendants concealed material non-public information concerning AT&T and AWE that they were not precluded from disclosing under law, and the purchases by the Plan that are the subject of this action were not fair and reasonable and for adequate consideration.

40.    Defendants breached their fiduciary duties in that they should have known that the Plan should not have invested in AT&T and AWE stock.

## FIRST CLAIM:INVESTMENT IN AT&T AND AWE STOCK

41.    Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

42.    Pursuant to ERISA §409(a), 29 U.S.C. §110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA §404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

43.    Pursuant to ERISA §404, Defendants have a duty to discharge their duties with respect to the Plan prudently and solely in the interests of Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and their Beneficiaries. A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the plan, including employer securities, to ensure that each investment is a suitable option for the plan. Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties. As a result of the Plan's failure to sell AT&T and AWE stock, purchases of AT&T and AWE stock, and continuation of AT&T and AWE stock as an investment alternative under the Plan, Defendants breached each of these fiduciary duties.

44.    As a consequence of Defendants' breaches, the Plan suffered losses.

45.    Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach.

46.    Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), the Court should award equitable relief.

19

## SECOND CLAIM: MISREPRESENTATION AND NONDISCLOSURE

47.    Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

48.    Pursuant to ERISA §409(a), 29 U.S.C. §110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA §404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

49.    Pursuant to ERISA §404, Defendants have a duty to discharge their duties with respect to the Plan prudently and solely in the interests of Participants and Beneficiaries and for the exclusive purpose of providing benefits to Participants and their Beneficiaries. This duty entails: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might he harmful; and 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. This duty to disclose and inform recognizes the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the participants and beneficiaries, on the other. In a plan with various funds available for investment, this duty to inform and disclose also includes: 1) the duty to impart to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average plan participant of the risks associated with investing in any particular fund; and 2) the duty not to make material misrepresentations.

50.    Defendants breached these fiduciary duties in that they made material misrepresentations and nondisclosures as alleged above.

51.    The Plan, and the Participants acting on behalf of the Plan, relied upon, and are presumed to have relied upon, Defendants' representations and nondisclosures to their detriment.

52.    As a consequence of Defendants' misrepresentations and nondisclosures, the Plan suffered losses.

53.    Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach.

54.    Pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), the Court should award equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    Actual damages in the amount of any losses the Plan suffered to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

B.    Equitable relief;

C.    Costs pursuant to 29 U.S.C. §1132(g);

D.    Attorneys fees pursuant to 29 U.S.C. §1132(g) and the common fund doctrine; and

E.    Such other relief as the Court may deem equitable and just.

DATED:  November 11, 2002                    Respectfully Submitted,

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By: _____
Lisa J. Rodriguez (LR6767)
3 Kings Highway East
Haddonfield, New Jersey 08033
(856) 795-9002

**SCHATZ & NOBEL, P.C.**
Robert A. Izard
Andrew M. Schatz
Wayne T. Boulton
330 Main Street 2nd Floor
Hartford, Connecticut 06106-1851
(860) 493-6292

22